[Crim. No. 6639. Second Dist., Div. One. Nov. 18, 1959.]

THE PEOPLE, Respondent, v. MELVIN WILLIAM DUNCAN, Appellant.

---

Burton Marks for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Marvin L. Part, Deputy Attorney General, for Respondent.

LILLIE, J.—The trial court sitting without a jury adjudged defendant guilty of two counts of selling heroin in violation of section 11500, Health and Safety Code, as charged in an indictment, and found a prior misdemeanor conviction alleged therein to be true. His appeal from the judgment and order denying him a new trial is predicated on two assignments of error—abuse of discretion of the lower court in denying his motion for continuance, and the trial judge's refusal to permit him to act as his own counsel.

In arguing that it was error to require him to proceed without allowing him a reasonable time in which to locate the informant for the purpose of aiding him in the preparation of his defense, appellant cites such cases as *People* v. *Lawrence*, 149 Cal.App.2d 435 [308 P.2d 821]; *People* v. *Williams*, 51 Cal.2d 355 [333 P.2d 19] and *People* v. *Durazo* *(Cal. App.), 332 P.2d 182, advancing the position that the testimony of the informant was relevant and material to the issue of identity of the person with whom the officer had the two sales transactions. The record before us admits no application of the rules set forth in these cases for here no informant was either directly or indirectly involved in the offenses of which defendant was convicted; not only was no defense made at the trial, but there is no proper disclosure of what it might have been had defendant offered one or testified; and the evidence, consisting of the uncontradicted testimony of the officer, is overwhelming in support of defendant's guilt.

As to Count I, charging defendant with sale of heroin on March 26, 1958, the record shows that Officer Williams, an undercover operator, seated alone in his car observed defendant whom he knew walking down Fifth Street. He called to him and he entered the car where they discussed shirts. When defendant asked him if he wanted some "stuff" and he answered "yes," defendant asked him to drive around the block. During their conversation the officer told him he "just horned the stuff," and the defendant said: "All I know you from is

---

*A hearing was granted by the Supreme Court on January 28, 1959. The final opinion of that court was reported in 52 Cal.2d 354 [340 P.2d 594].

Slim.'' When they parked, a woman unknown to the officer, but known to the defendant, walked up and told defendant she had the ''stuff'' but needed an outfit to take it. Defendant said he could get her one, and she, too, entered the car. The officer drove away with the two of them and while driving defendant gave him a green balloon of heroin for which he paid him $9.00.

Count II charged defendant with another sale on March 28, 1958. Officer Williams, again alone, saw defendant walking on East Fifth Street and motioned to him to go into a liquor store. When defendant asked him if he was going to get some wine or wanted something else, and he answered ''both,'' defendant bought some wine and got into the car which the officer drove to Ceres Street, parking by a vacant lot. There he gave $9.00 to the defendant who left, returned seven or eight minutes later and handed him a white balloon containing heroin.

On cross-examination of the officer, defense counsel asked him if he had related all of the transactions he had with defendant, to which he answered ''no.'' When he asked the officer concerning another sale by defendant on a prior date not charged in the indictment, the court sustained the People's objection. However, he did elicit testimony from the officer that he had seen defendant prior to March 26 and discussed with him the sale of some shirts, but that he had made no arrangements with the defendant pertaining to the future purchase of narcotics, or another meeting. Later the prosecution withdrew its previous objection to questions concerning other sales with defendant and the officer testified that he saw defendant on three or four occasions prior to March 26 and was originally introduced to him by an informer named ''Slim'' on March 21 or 22; that the second time he saw defendant ''Slim'' was with him and it was then or shortly thereafter, but still prior to March 26, that through ''Slim'' he purchased heroin from the defendant for $5.00 and several shirts; and that at that time he handed the money and the shirts to ''Slim,'' who passed them to defendant, and in return defendant handed a balloon containing heroin to ''Slim'' who passed it to the officer. The informer was known to him as ''Slim'' and sometimes ''Coffee,'' and the officer described him, the places he frequented, and how he had met him. When the People rested, defendant asked for a continuance to permit him an ''opportunity to locate the individual that the officer has described.'' The request was denied.

■ The basic issue involved in the first claim of error is whether the lower court abused its discretion in denying the motion for continuance (*People* v. *Mackey*, 171 Cal.App.2d 513 [340 P.2d 688]). The evidence establishes without contradiction that, although having previously introduced defendant to the officer and arranged a sale (not charged in the indictment) between them several days prior to March 26th, the informant had no part in the sales of March 26th or 28th. He made no arrangements for the meeting between the officer and the defendant on the 26th or 28th, and neither participated in either meeting nor set up the sales arising therefrom. Indeed, the officer himself had no prior appointment with defendant for either of those days and the encounter in each instance appears to have been entirely unarranged. The informant was in no way a participant in, nor an eyewitness to, either sale charged in the indictment; he was not present with the officer and defendant on March 26th or March 28th and as far as we know was completely unaware of the two meetings; he had no independent knowledge of either offense; and was in no way responsible for pointing an identifying finger at defendant at either time or upon his arrest. Thus we are unable to appreciate how or in what manner the informer's testimony could have been material to the issue of defendant's guilt.

.Relying heavily on *People* v. *Williams*, 51 Cal.2d 355 [333 P.2d 19], and *People* v. *Durazo* (Cal.App.), 332 P.2d 182 (now cited as 52 Cal.2d 354 [340 P.2d 594]) appellant argues that had the trial court heard "additional evidence which tended to create a reasonable doubt whether appellant was really the same person described by the officer as having also had various dealings with him before March 26, there would thereby have been established basis in the evidence for a reasonable doubt whether appellant was in fact the same person who sold heroin to the officer on March 26 and March 28." These cases present factual situations entirely dissimilar to the one at bar; moreover, in each, the sole defense of mistaken identity was supported by the testimony of the defendant himself who took the stand and denied he was involved in the sale.

In the instant case no specific issue of identity was presented —defendant neither took the stand nor offered a defense; and the officer's testimony of defendant's guilt and identity stands uncontradicted and unimpeached. He made no effort during the six months before trial to locate the informer, interview him or call him as his witness, and obviously he was

far better known to defendant than to the officer. We do not know what his defense, had he offered one, would have been. We are doubtful, however, that it would even have been one of mistaken identity in view of an implied admission growing out of his voluntary outburst in court. When the officer was asked "Have you made more than two buys from the defendant?" and he answered "I did," the defendant cried out: "You did? I never seen you before in my life *until the 26th*."

As to how the informant might actually have aided defendant in the preparation of a defense we are unable from the record to say; even his counsel did not know. When the district attorney indicated he would not oppose the continuance if defense counsel sincerely believed that the informant would aid in the defense of his case, the latter advised the court, "I might say I have no information or belief on that point." We do not believe under the circumstances here involved it can be said that the lower court abused its discretion in denying the defendant's motion (*People* v. *Mackey*, 171 Cal.App.2d 513 [340 P.2d 688]). We find neither error on the part of the trial court, nor prejudice to the defendant arising out of its denial of his motion for continuance.

Defendant moved for a new trial or, in the alternative, to reopen the case, predicated on his need for an opportunity "to attempt to capitalize on the information" given by the officer concerning the identity and whereabouts of the informant "if he exists and if he could be located," and asked for a continuance of three weeks. Nothing in support of either motion was presented to the trial court by way of affidavit, testimony or argument. Defendant did not, and could not, advise the trial court of the testimony the informer might give, for indeed, he had never, in the month and half between the trial and the motions, located him or made any effort to do so. He did not, and could not, represent to the court in what manner such testimony might have aided him in the preparation of his defense. The most that can be inferred from his brief argument on the motions, is the result of sheer speculation—*if* the informer exists and *if* he could be located and *if* he testified, his testimony *might* have a bearing on the question of identity. Thus we cannot say the trial court abused its discretion in denying the motions.

Appellant further claims he was denied the right to act as his own counsel at the trial. He refers to a number of colloquies between him and the trial judge at various times during the proceedings to demonstrate that he wanted an

attorney but preferred to act as his own counsel in lieu of the public defender; and offers several cases for the proposition that the judgment should be reversed because he wanted to represent himself and was denied the right to do so. Neither the record nor the authorities cited by him lend merit to his contention. Too extensive to quote in detail, we refer only briefly to the various conversations between defendant and the lower court, but they serve in each instance to establish the fairness and concern of the trial judge for a man who clearly was not capable of defending himself; disclose the many continuances granted at his request (resulting in a cumulated six months' delay in trial) to permit him to obtain a counsel of his choice or represent himself and properly prepare for trial; and reflect defendant's entire lack of co-operation and obdurate refusal to place himself in a position to eventually go to trial.

In Department 41 on April 28, the public defender was appointed to represent the defendant who was told that if he retained private counsel he could be substituted for the public defender. At his request the arraignment was continued to May 1. On May 1, defendant entered his plea and the trial was continued to June 13 in Department 45. Defendant told the court he wanted a "paid attorney," not the public defender, and although he had no money with which to retain one, nevertheless demanded one be given to him. He at that time admitted he could represent himself, and upon his request was granted a month's continuance. On July 15, defendant made no mention of a lawyer or his representation, but asked for a further continuance to August 19. On August 19 the case was called for trial. Defendant said he was not ready, did not have adequate counsel, had no money with which to retain a lawyer and wanted the court to "subpoena a new attorney." Upon his further request for a "change of venue," the case was transferred to Department 41 and the trial continued to August 25. On August 25, defendant told the judge he was a pauper, asked him "to appoint adequate counsel, someone to handle my case, a lawyer from the Bar Association" and requested a continuance. The trial judge told him the public defender is from the Bar Association and very adequate, but continued the trial to October 15 in Department 43. When the case was called on October 15, defendant again told the court "I want a lawyer," and "if a man not to have money to obtain a lawyer, you supposed to give him one." The public defender who had been represent-

ing him throughout stated in open court that although defendant was not required to keep him, if he did discharge him then he would have to go to trial without counsel. Whereupon the court advised defendant he had a right to discharge the public defender and represent himself, and asked him what he wanted to do. The defendant then discharged him but advised the court he was not ready for trial. When asked when he would be ready defendant answered "when you give me a lawyer." The court then asked him if he wanted the public defender and defendant answered he did not, he was not ready for trial, and wanted a "change of venue." Thereupon the court transferred the case to Department 70 for trial at 1:30 that afternoon. At 2:30 when the case was called defendant told the judge in chambers he was not ready for the trial and wanted counsel. The judge advised him the same public defender was available but the defendant declined his services, demanded a lawyer but said he had no money. Asked by the court how he expected under the circumstances to employ counsel, defendant replied that the United States Constitution protects him, he wanted a lawyer from the Bar Association, not the public defender, and a "change of venue." The court then made it clear to the defendant that if he did not use the services of the public defender and represented himself he would be entitled to no more advantage than if he had a lawyer, and it would hold him accountable to all procedures and rulings as though he were represented by counsel; that if the question came up it would advise the jury that he was representing himself, wanted nothing to do with the public defender and had discharged him; and that it would not bend backward "one way or the other." The district attorney then said he felt, in view of defendant's limited knowledge of the law, it was inadvisable for him to go to trial without being represented. Thereupon, the court advised the defendant not to discharge the public defender, that he is very capable and well versed in the law and it would be a mistake to proceed without him and defend himself. The defendant then acceded saying, "I will have to accept him, the way you put it." The case went to trial. Defendant was represented by the public defender who six months before had been originally appointed to represent him.

Further discussion between defendant and the court, too lengthy to here set forth, occurred during which defendant

employed various and numerous legal words and phrases out
of context, referred to "due process" and "the Constitu-
tion" without specific application, and used language having
little or no real meaning or significance in the manner em-
ployed. It was apparent that he had no legal knowledge,
lacked ability to express himself clearly even in the simplest
terms, misconstrued the law and its application and mis-
understood his right to counsel, claiming on the one hand
he had no funds and demanding, on the other, the court give
him a private lawyer from the "Bar Association." It is also
obvious from his many requests for continuance (six in all,
five of which were granted), his manner of discussion with
the court, his inclination to be argumentative and his re-
peated requests for a "change of venue" (three transfers
were made), that his main object was to cause confusion and
place himself in a position in which he could avoid trial.
During the entire six-month period, at all times showing dis-
satisfaction with the public defender, he continued to demand
a private lawyer knowing he had no funds, but made no
arrangements for one; realizing he could otherwise represent
himself, he made no effort to prepare his case for trial, but
continued to insist that under the Constitution he had the
right to "subpoena" a new lawyer and that, if he had no
money, the state was "supposed" to give him a lawyer be-
cause it had "plenty of money."

 A defendant unable to employ counsel during pro-
ceedings before the trial court has "as a matter of absolute
right but two choices in the manner of a court-appointed
attorney: he can accept representation by counsel . . . or he
can elect to represent himself" (*People* v. *Mattson*, 51 Cal.2d
777, 794 [336 P.2d 937]). Appellant claims he had the
latter right denied him when the trial judge advised him that
if he insisted on representing himself he would so inform the
jury, which "most *probably* was received" by him as a threat
and he "*probably* would not have accepted the services of the
Public Defender but for the remarks of the trial court in
chambers." (Emphasis added.) There is an entire lack of
merit to appellant's claim, first because it is apparent both
from his conduct before the trial judge, and his opening
brief, that he *actually* never wanted to represent himself and
what he really wanted was the court to give him private
counsel at no cost; and second, because nothing the trial judge
told the defendant concerning his status in propria persona
and what he could expect during the trial, was improper and

could constitute the kind of "threat" or "coercion" which would justify this court in reversing the judgment.

That defendant did not at any time really want to represent himself is borne out by his conduct during the six months he was given to prepare for trial—his repeated requests for a continuance, his continued dissatisfaction with the public defender, his admission he lacked funds to retain private counsel, his refusal to arrange for one to represent him, and his failure to prepare to represent himself; and his complaint to the trial court after he discharged the public defender and was representing himself that he wasn't ready for trial and requested a further continuance because "I want to have counsel." Had he actually wanted to represent himself as he now claims, he had ample time within which to prepare his defense and could have then proceeded without further incident. Up to the time he asked for the continuance the court obviously intended to permit him to represent himself but when he said he wanted counsel, the court very properly again advised him to accept the services of the public defender—the only counsel available for an indigent defendant. He wanted counsel and the court acceded to his request by providing him with one.

As to what the trial judge told defendant concerning his status without counsel and what he could expect during the trial, we see involved no "threat" or "coercion" which would justify appellant any relief. It is significant that in his opening brief he does not even now represent unequivocally that he was coerced and that the coercion caused him to forfeit this right to represent himself; instead, he says that the judge's statement was "*most probably*" received by him as a threat and he "*probably*" would not have accepted the public defender but for his remarks.

Moreover, the trial court was fully justified in its opinion that the public defender was well qualified (*People* v. *Adamson*, 34 Cal.2d 320 [210 P.2d 13]; *People* v. *Hood*, 141 Cal. App.2d 585 [297 P.2d 52]); and his statement concerning what he might be compelled to tell the jury in the event the question arose, was entirely proper (*People* v. *Mattson*, 51 Cal.2d 777 [336 P.2d 937]; *People* v. *Linden*, 52 Cal.2d 1 [338 P.2d 397]). It was a mark of fairness on the part of the court to forewarn the defendant of the true fact—that he was not entitled to any special privileges by appearing in propria persona. It is well settled that if a defendant elects to represent himself he "must be prepared to be treated as hav-

ing the qualifications and responsibilities concomitant with the role he has undertaken; he is not entitled either to privileges and indulgences not accorded attorneys or to privileges and indulgences not accorded defendants who are represented by counsel (*People* v. *Chessman* (1951), 38 Cal.2d 166, 174 [2] [238 P.2d 1001].)'' (*People* v. *Mattson,* 51 Cal.2d 777, 794 [336 P.2d 937].)　　As in *People* v. *Linden,* 52 Cal. 2d 1 [338 P.2d 397], ''Out of the presence of the jury the court fully and correctly advised the defendant concerning the right to counsel, the lack of special privilege to a defendant who insists upon representing himself, and the absence of any right to advisory counsel in the capacity of 'errand boy,' all in substantial accord with the law as stated in *People* v. *Mattson* (1959), 51 Cal.2d 777, 793, 794-795 [336 P.2d 937].'' Since it is clear to anyone reading the record that the indigent defendant actually wanted the court to provide private counsel at no cost to him and really did not want to represent himself, the trial court quite properly concluded that he wanted a lawyer and needed one, and gave him the best counsel available under the circumstances. In doing so, the court's discussion with the defendant was not words of coercion as now claimed by him, but words of advice properly and fairly given; and for whatever private reason defendant did not wish to accept the services of the public defender, he did so not out of threat or coercion, but out of necessity, created by his own actions and the final realization that he was unprepared, would not be given any further continuances, faced immediate trial, needed assistance, and the court did not intend to give him a private attorney.　　Defendant's right to represent himself no more includes the right to reject the services of the public defender and postpone indefinitely the trial, allowing him to at his leisure attempt to find counsel who will serve without charge, than does defendant's right to counsel (*People* v. *Adamson,* 34 Cal.2d 320, 332-333 [210 P.2d 13]).

It is also significant that nowhere in the record is there any objection made by defendant to the trial court that he was being deprived of his right to defend himself. His only complaint seems to be that he was entitled to a ''paid lawyer'' from the Bar Association and was entitled to a further continuance and a ''change of venue.'' Represented throughout the trial by the public defender, defendant at no time before the trial or this court has shown that he was in any way prejudiced or handicapped by the manner in which the public de-

fender handled this case. Of interest at this point is *People* v. *Ray*, 146 Cal.App.2d 257 [303 P.2d 591], wherein at the arraignment an indigent defendant stated he would rather defend himself; the court instead appointed the public defender. Throughout the trial he cooperated with him and made no complaint he was deprived of the right to defend himself. Said the court, at page 259: "An accused cannot remain silent gambling on his chances for a favorable verdict and when the verdict has gone against him raise objections of which he knew and which could have been raised during the trial."

For the foregoing reasons the judgment and order are and the same is each affirmed.

Wood, P. J., and Fourt, J., concurred.